Thank you, sir. You're up. Thank you, Your Honor. May it please the Court, I am Paul Korber. I have the privilege of representing Rudolph Viener in a somewhat unique case for this Court in a choice of laws involving alienation of affection. That's one euphemistic way to put it. Yes, Your Honor. And, of course, Mississippi now stands as one of the few states in the nation that recognizes this tort. I don't think that there's any dispute between the parties that it's a substantive law claim. And, likewise, that we're down to determining whether the law in Mississippi or the law in Louisiana applies. And, of course, Louisiana does not recognize this tort. So it's an analysis of what's the most significant relationship test. And reviewing the restatement of conflicts of laws and choice of laws analysis, you've got four parts there. And I would submit that actually the residency of the parties, that's not in dispute. Mr. Viener lives in Louisiana. Mr. Casano is a lawyer in Mississippi. And, of course, the claim is that Mr. Casano engaged in conduct that resulted in the alienation of Mr. Viener's wife from him, to whom Mr. Casano is now married. And, likewise, it's not a dispute that there's really no relationship between Mr. Viener and Mr. Casano that preceded any of these actions. So we're really down to an analysis of two parts of this. And that is the place where the injury occurred and the place where the conduct causing the injury occurred. So our position in that is that you must then look to Mississippi's law, and it's particularly under Bland v. Sealy. It seems like everybody agrees that the affair began in Florida. But at least in reading the recitation of facts, there seems to be a little bit of a disagreement about how many, shall we call, affair incidents occurred in Mississippi. Can you clarify that? You say, I think, that it's more than they say. Let's just put it that way. Yes, Your Honor. I think Mr. Casano says it was only once. Well, and then even looking at the case that the district court looked at. And, of course, this case is a de novo review here, so the court must look at all the facts anew on this matter. And the district court looking at the Hancock v. Watson case. And, first of all, and there are a number of other cases that say it's not just necessarily where the sexual encounters occurred. The testimony and depositions that have been submitted and so forth is that they had sex in Florida, Mississippi, Alabama. And Louisiana. And Louisiana. They even went on a trip to New York at one time before. New York. Yeah. New York City. He took her to New York supposedly to buy wine for his wine store that he also owns in Diamond Head, Mississippi. So he deducted the trip. That's one other aspect. But looking as well at the Hancock case where they talk about it's more talking about the scope of an in-depth factual analysis of the scope of the relationship. The manner and frequency of communication between them. But don't you have the problem that, okay, so they're traipsing across the South with the exception of the New York trip in person. And then they're talking on cell phones. And, I mean, naturally one of them's in Mississippi and one of them's in Louisiana. So how does that all this talking on cell phones and Skyping and whatever else they were doing when they weren't physically together, how does that help us here? Well, I think that looking at where's the principal location of the conduct of the defendant. And that is an analysis even under the comment to restatement section 154. Where's the principal location is the most important of all the conduct. So physically the fact that he's sitting in Mississippi talking on his phone is meaningful even though he could be in Florida talking on his phone. He could be in New York City. He could have happened to cross the border to Louisiana while he's on his phone. I guess I'm having trouble with why where you are when you're talking on a phone is relevant to this whole consideration. Well, some of the cases talk about that very thing because in Blaine v. Hill they're looking at the wrongful conduct of the defendant that then caused the loss. And Judge Haines, I would point out that in what... The first wrong was the sexual encounter in Florida. And from there it sort of, as far as your client was concerned, went downhill because they continued on this affair. So why isn't that the relevant place? And the phone calls was much less of an issue than all the traipsing around. And there's a lot of talk in some of these text messages. There are, in less than a month, Judge, after that initial little tryst at the Mississippi Bar Convention in Florida, 405 text messages between the two of them. That's just before the divorce was even filed in Louisiana. They had that going on. Then we get to October. He first meets the children of the parties. And in November, Mr. Cassano then starts sending emails and talking even about several things. Divorce strategy, a potential witness, marital property and custody with the former Mrs. Viener's attorney. He buys her a Mercedes automobile in Mississippi and gives it to her. He has a computer of Mr. Viener's taken to Gulfport, Mississippi to be analyzed. And so the- Okay, but they, Mr. Cassano claims that August 7 is kind of the cutoff date, if you will, for considering all the contacts because that's when Mr. Viener already filed for divorce. And so by then, the affections had been alienated and were kind of done. And thereafter, it's just more of the same. So what do you say to that? Well, on that point, though, the divorce certainly wasn't final until December the 9th of 2015. If you look at the case of Anderson v. Ladner, which is at 198 Southern 3rd, 381 Mississippi Appellate Court Case 2016, although that case dealt with a statute of limitations argument, what the court said in that case was that it wasn't when the divorce was actually filed because the parties could have dismissed it and reconciled it. In fact, that very thing happened in 2012 between the Vieners. But, I mean, you can reconcile after divorce. It certainly can. So it's always true when we're talking about matters of the heart that things can change. That said, it seems like if we're talking about alienating an affection, it was pretty alienated when the husband files for a divorce because of the affair. Well, and that then is looking at the impact or the damage to Mr. Viener. However, the cases in a choice of laws analysis focuses on the conduct of the defendant and what he's doing. And that conduct persisted throughout and until the divorce was final. What is there to say that they could not have reconciled before the divorce was entered? And in that case, I kept looking at these cases coming out of Mississippi. Does the question of when, because the ultimate analysis for conflicts of the law is the place where the conduct occurred, the principal location of where the conduct occurred. Well, does when answer the question of where? And in our minds and our position is that it was alienated certainly when the divorce was final. And like you mentioned, they could have reconciled and remarried even after the divorce. But the Casanos, they got married in January of 2016 after the divorce was final in 2015. Take me through how you quantified this loss of affection in dollar terms. Where did the number in your complaint come from? The number in the complaint comes from the marital property issues involved in the case, the attorney's fees cost in the divorce case that was precipitated by that. All the other expense of even, they've gotten into, Mr. Casano, for instance, even filed a criminal charge against Mr. Wiener for a key scratch on his car. So Mr. Wiener had to hire a criminal defense attorney to represent him in that matter. And these were matters that occurred before the divorce was even final. So we haven't even gotten to quantifying damages in the case. I think that where to focus on choice of loss in the most significant relationship test falls on the place where it happened. I kept coming back to the bottom line that but for the conduct of Mr. Casano emanating out of Mississippi, where his law office is, where his $500,000 house is, where his 52-foot house is, all those things are coming from Mississippi to entice. The question and the cases point to this specifically in Fitch v. Valentine, which I thought was a great name for an alienation of affection case. But the persuasion, the enticement, the inducement, where did that start? Okay, but if he's enticing in Mississippi, then isn't the place of injury the place where the enticement finds the heart and the heart gets stolen? And that's Louisiana. That, I would submit, weighs both ways with one major tipping point, and that is that the injury ultimately came about, was manifest when Mrs. Wiener then moves to Mississippi to be with Mr. Casano. How many states allow this tort? I believe it changes, Judge, and I want to say that it is six states. Just as a policy matter, how would you describe a state's interest in maintaining this tort? What is the purpose of it? And actually, that's the final kind of issue here on this choice of laws matter because Mississippi has historically, I mean, alienation of affection, cause of action has been challenged many times that we should do away with it. At one time, we had a claim called criminal conversion, and that is where, in this case, Mr. Casano and Mrs. Wiener engaged in adultery and that there's actually a criminal statute in Mississippi that makes adultery a crime. My point is something a little different. I mean, it seems that Mississippi has this tort on the books because they want to allow citizens of Mississippi to invoke this tort, to bring this claim against a paramour or a homewrecker or whatever you want to call it, but that's not this case. Your client, or Mr. Casano rather, he's a defendant. He's not a plaintiff. And I'm just puzzled why Mississippi has an interest in letting one of its citizens, who was involved in the breakup of a marriage of two Louisiana citizens, why is Mississippi interested in letting one of its citizens be sued by a Louisiana citizen? And, Your Honor, you're exactly right. If you look at the cases that are cited by all parties, the Knight case versus Woodfield, Thomas versus Scripp case, both of those involve Mississippi marriages. The only case on the book so far that I've been able to really find that really addresses this is Miller versus Provident, which has actually involved the golfer John Daly. His marriage was in Tennessee. He was having an affair with a resident from Florida, but she was working south of Memphis at Hooters and ended up becoming engaged with her. Well, both the district court and the appellee have cited this statement that while the state's interest is not as strong in that case because it was not a Mississippi marriage, where both the district court and the appellee stopped was that the Miller court went on to say, we still conclude that Mississippi has a special interest in this case because it was the site of the tryst of the conduct of the defendant where that occurred. But the tryst here, there was only one incident in Mississippi, right? I mean, putting aside the cell phone issue, but the sort of tryst, as you call it. At his residence, which is less than an hour from where the Wieners were residing in Louisiana, and that came about likewise with there at their home. But that's why I don't think that just where all the sexual encounters occurred necessarily gives a conclusion to this case. I think it is where the cases are talking about and including the restatement's comment on this, where is the principal location of Mr. Cassano's conduct is the most important of all conducts, and where that conduct can be assigned is a principal location. It's not the only location. It is the principal location. I thank you for answering me. I kept you over time. I'm sorry. I apologize to the Chief. No, no worries. Thank you. We have your opening argument, and you preserve rebuttal time to come back up. Thank you, Your Honor. All right, we'll hear from Mr. Dornan. May it please the Court, I'm Don Dornan from Biloxi, on behalf of the appellee. What I want to talk about today is choice of laws for sure, but I want to talk about choice of laws and personal jurisdiction. There seems to be some confusion in some of the arguments, some of the briefing on behalf of the plaintiff. It's a very different analysis and has different policy factors, and I want to talk about what the public policy of Mississippi is when it comes to the protection of marriage. And if I have a minute, I want to talk about the de facto presumption that takes place when a court determines that the center of gravity is in a particular state, and that's language out of the reason. The district court properly applied all these complex rules, all these choice of law rules, properly followed Mississippi's choice of laws analysis, correctly weighed the public policy factors, and I agree that this court's standard of review today in this case is de novo. I agree with that, and I would respectfully suggest that when this court conducts its own analysis of these factors, you're going to be led to the same conclusion that Judge Oserton was because the cases that are going to take you there are Boardman, cited by both sides, and Zurich American Insurance Company, which are the choice of laws cases coming out of the Mississippi Supreme Court. The plaintiff has not given you any basis. I would submit to conclude that the center of gravity is in Mississippi. In order for Mississippi law to apply in this case, your de novo review has got to place that center of gravity, that is, where the majority of the contacts and the conduct and the injury took place, they've got to land in Mississippi. And what we have in this case is multiple connections that weigh heavily on Louisiana. We have Louisiana marriage, Louisiana residents, domicile there. But what about the fact that the wrong, the alienation, was largely occurring in Mississippi by your client being on cell phones and whatever else he was doing to communicate with her and encourage what ultimately resulted, which was she left husband number one for husband number two? We don't have any case law in Mississippi that addresses telephone calls or text messages or media type of communications as choice of law factors. The cases on personal jurisdiction are full because what they have held in these personal jurisdiction cases that the plaintiff confuses with choice of law, they've held that text messages and phone calls from another state into Mississippi accompanied by alienation of affection is enough to satisfy due process under the long-arm statute to allow a foreign defendant to be brought into a Mississippi court. That's the commission in whole or in part of a tort. We don't have any cases that say conduct such as phone calls or text messages are even a factor that a court would apply or look to. But if we're focusing on the actions that caused the harm, wouldn't we care where those actions took place? We do because the restatement tells us that we should consider those factors. Okay, and he's saying those largely occurred in Mississippi after the original tryst in Florida. That's true. There was contact in Florida. There was contact in Alabama. There was what I believe was minor conduct in Mississippi, one occasion of a physical encounter, numerous physical encounters and meetings in Louisiana, and the record's pretty clear on that. But is it the physical encounter that we're limited to? That's the question. I don't know that you're limited to it because you all get to interpret what the restatement says and what it means. But what I would suggest in terms of weighing, if you're going to say text messages and phone calls are factors and you'll be adding to the language of the restatement if you do that, but if you say that, okay, how do those weigh against what we know we have in Louisiana, which is significant conduct, domicile, and the location of the marriage? So what is important, and I think your question, Judge Haynes, earlier touched on it, what's equally important is where did the injury take place? Where was, as you say, where was the heart stolen, if you will? And that's in Louisiana, and that's because this marriage existed in Louisiana, and it still exists in Louisiana to some extent in the sense that Louisiana courts are still supervising child support and child visitation and things of that nature. Does Mississippi have an interest in protecting all marriages and not just Mississippi marriages? In other words, that Mississippi is sort of a safe space for marriages and you can feel comfortable that you will not have the heart stolen in Mississippi. Can it have that interest? I think that is the issue in this case. I think that is the issue. And here's how it comes up. Does Mississippi have an—we know Mississippi has an interest in protecting the marriages, Mississippi marriages of Mississippi residents. That was Judge Willard's question. That's the answer to that question. Mississippi has clearly said, our court, that we have—we're keeping this cause of action, even though everybody else is doing away with it, we're going to keep it because we want to protect Mississippi marriages of Mississippi residents. But doesn't Mississippi also have an interest in holding its citizens accountable for breaking up a non-Mississippi marriage? That has not come up, and we don't have any expression by the Mississippi Supreme Court to answer your question that anywhere near the same interest would apply to a foreign marriage. Our court has never said that. There's nothing to base any pronouncement of it. We don't have any legislative enactment that says that. The Mississippi Supreme Court has never gone so far as to say we have a policy that would protect a foreign marriage, especially in an alienation case. So Judge Oserdon said in his ruling, he said, well, if there's a public policy, it's not strong. I've looked and dug and tried my best to find any inclination or inference or something implied in Mississippi jurisprudence that would say, well, okay, we want to protect marriages generally, therefore maybe, even though it's unexpressed, maybe we'll say we want to protect a foreign marriage. We don't have that. Well, protect a, quote, foreign marriage from interference by a Mississippi citizen. That's a little bit more specific. And I agree with that. And, I mean, you have an interesting – I can remember when Texas had this tort and then they did away with it, and there was a series of states that had this tort for years and then did away with it, and Mississippi has clung to this cause of action and therefore has expressed, in my view, a strong policy that we care about these issues. And I don't know why that should be one-sided, whether it's only the heart that's taken has to be in Mississippi as opposed to the taker of the heart. And I think that's a fair statement, and it does cause a little bit of a head scratch. I would concede that. But on the other hand, we're sitting in diversity. You're sitting in diversity, and you've got to apply the choice-of-laws rules of Mississippi because you're sitting in diversity, as did the district court. And here's how that comes down. As I appreciate Section 154, it says, Where did the weight of the conduct that creates the center of gravity? Judge Osren, I think, correctly said that it clearly is weighed in Louisiana. 154 then takes us to Section 6 and says, It says, The center of gravity is where the conduct is weighed unless some other state's policy has a greater interest. That's what it says. So Judge Osren analyzed whether Mississippi had a greater policy. And so if we just, for the sake of argument, if we say, Okay, Mississippi doesn't have a pronouncement on that, we don't have a clear pronouncement, so we're going to maybe infer some unexpressed policy interest in protecting all marriages. Maybe we strongly are going to protect Mississippi marriages, but maybe it's not as strong for foreign marriages. So if you take that and you weigh that against the center of gravity, it does not overcome it. And the reason it doesn't overcome it is because the restatement tells us that once the court has placed the center of gravity in Louisiana, that's a de facto presumption. And I thought I knew what a presumption was, but this is a de facto presumption. I don't know whether that means it's a greater presumption or a stronger presumption, but it is not just a presumption. It's a de facto presumption. It always helps if you add some Latin. And I even looked it up again. I mean, so getting back, though, to the policy statement, I appreciate what you're saying, but, okay, so under diversity jurisdiction, what that means, as we know, is we look to the Mississippi, we look to their choice of law, and we say, What would they do? And we don't have a pronouncement one way or the other on this, do we, from the Supreme Court. We don't have them saying we're only protecting Mississippi marriages or we are protecting all marriages and we want Mississippi to be a safe space. We just haven't heard that one way or the other. They have not said that. They have certainly said we're protecting Mississippi marriages. We know that much. There's no question that they've said that. Right, but that's just because in those cases the facts were, you know, you and your next-door neighbor kind of facts, so it didn't come up. Yes, ma'am. State courts adjudicate state cases, and some of you all have done that. And so, but there's never been any extraterritorial applications suggested by any decision. What about this Miller, the Hooters case? The Miller case is a good case, and I'm glad that case came up because when you go and look at that case, you'll see that that case is about personal jurisdiction. It's not about, I mean, that's- I did see a lot of overlap. But while I totally agree that personal jurisdiction and choice of law are different, can we not be informed by some of the comments in these personal jurisdiction cases? It seems to me, for example, the S-Special interest that was argued a minute ago, in that case they're referring to the Mississippi long-arm statute, not to any choice of law or any policy. That's not what's being referred to. And so what Miller is so good for our side of the case about is this. Miller says you can hail a defendant into court under the long-arm statute under due process principles, but Mississippi still not have a public policy that would weigh a choice of laws to where Mississippi law would apply. That's what Miller stands for. And incites the Burger King case from the U.S. Supreme Court that says that, which basically is these factors can be accommodated by applying the correct choice of laws rules. And so bringing me back to – bringing my argument back to that, you've got the center of gravity in Louisiana. You have maybe an unexpressed or implied policy of Mississippi that is not strong. We know that the policy to protect Mississippi marriages is strong because they use it in a plot. So if the Mississippi public policy, if there is one, and I'm not here to say that there is one, but if there is one, it's not strong. If it's not strong, then it's not going to be able to rebut or overcome the de facto presumption that the center of gravity in this case is in Louisiana. And so I think the issue in this case is, as you say, does Mississippi have a public policy that would protect a foreign marriage? As I stand here, I don't think we know. But if we do, it's not strong enough to overcome the de facto presumption. All right. Thank you, sir. All right. Back to you, Mr. Jordan. Thank you, Your Honor. Mr. Carter. Actually, this is the first time that I've heard that there is a question as to whether Mississippi law protects non-Mississippi marriages by counsel. In fact, what I've looked at is the very case in Boyan v. Hill, citing another case, Saunders v. Offord, that talks about the very fact that the traditional families under attack both locally and nationally in these days, this court should not retreat now from the sound view of the tort of alienation of affection of theirs. The Miller case specifically says, and in talking about policy in Mississippi, says that Mississippi has a special interest, and that is because the actions of John Daly and his subsequent fiancee occurred in Mississippi. It's a Tennessee marriage. And to answer your question, Judge, another state that recognizes the tort of alienation of affection, as I recall, is Hawaii. And I've not seen a case from Hawaii, but would Hawaii then become a location to where you can take another man's wife, or a man take another wife, take another man's husband, go to Hawaii, and that's where the alienation occurs, and then there gives rise to a claim. Our position certainly is that Mississippi's state interest is not limited just to a Mississippi marriage, and that Mississippi does not want to become a haven or a place for where the institution of marriage could be eroded. Does it matter that the quote you gave from Bland is from a concurring opinion? It is from the concurring opinion, but it also was a case involving, as well as the Fitch case, where there had been a lot of questions. Is this a tort that we should do away with, such as Texas has done away with and other states as well, including Louisiana, has made it really clear from the very get-go that they did not recognize that tort. So, again, it's an issue that's not been, I would say, clearly defined by the Mississippi Supreme Court and would be an issue ripe for certification of a question to them. Answer this for us. You want us to certify the question to Mississippi? Yeah, they'd love it. You'd get an answer in about four years. Yes, sir. I mean, not bad-mouthing them, but the state courts have a lot of business to do, and so they handle certified questions, but that's certainly not the primary deal here on the case. But anyway. So the question would be, does Mississippi public policy protect a foreign marriage from a Mississippian's interference with it? Correct. Well, you didn't. By my eyes, that was not teed up to the district court. Yeah, you didn't ask for it. And I'm not. Never mind. I did raise certification of the question. I mean, you're obviously an able advocate. Thank you, Your Honor. And you see opportunities where they loom, and you're nimble about pursuing those. But nonetheless, we take this record coming up. All right, you've got 57 seconds. In my final comment, Your Honor, I would just simply say that in this analysis of most significant relationship testimony, you look to the conduct of Mr. Cassano, and that conduct emanates, he entices, he persuades, and he induces Mrs. Veen. That is where the principal location of his conduct is, and the choice of laws is Mississippi law. That sounded like your jury argument. Thank you, Your Honor. So far, an interesting case, to put it mildly. But a good point for the panel to take a brief recess before we take the other case.